## ELLIS v. EDWARDS et al.
### No. 5695.

Court of Appeal of Louisiana. Second Circuit.

June 30, 1938.

Rehearing Denied July 15, 1938.

Alwine L. Mulhearn, of Tallulah, and Charles Titche, of Monroe, for appellant.

Theus, Grisham, Davis & Leigh and Charles W. Easterling, all of Monroe, for appellees.

DREW, Judge.

This appeal involves a tort action instituted by plaintiff, alleging that his son, John Ellis, was run over and killed by a truck owned by defendant, John B. Edwards, and driven by defendant Edward's employee, Bernard Audrich, acting at the time of the accident in the scope and course of his employment.

The prayer of the petition was for damages as itemized; also judgment was sought from the General Accident Fire & Life Assurance Corporation, which had issued to defendant Edwards a policy of so-called public liability and property damage insurance.

There is no dispute of certain facts. These can be epitomized as follows:

On the morning of August 14, 1936, John Ellis and Luther Hammonds, who lived on Mr. Shelley Gaines' place in Richland parish, went to Monroe by train to buy a car for Ellis. During that day Ellis purchased a 1929 Model–A Ford coupe. That evening the two men drove toward home and at about 9:20 P. M., had a blowout of the left front tire, while on the turn-row through Mr. Gaines' farm. There were no tools in the car to repair the tire, so Luther Hammonds walked to his home and went to bed while Ellis remained with the car. This turn-row on which Ellis' car was stopped ran through a plantation belonging to Mr. E. S. Gaines. About 50 yards farther along the turn-row stood Sim Oden's house, where Ellis lived with his brother-in-law and sister, Mr. and Mrs. Oden. The turn-row continued past the Oden house for approximately three-fourths of a mile to a fork. One branch then led to the test oil well referred to throughout the testimony, which was a short distance from the fork. The other branch ran by Jim Hill's and Dan Christian's houses and wound through a Mr. Slocum's place back to the main road, being U. S. 80, a concrete highway.

Thus, as stated on the trial, there were two roads leading to the well—the turn-row by Oden's house and the turn-row by Christian's house. These two turn-rows joined close to the well. Also, it is to be noted that anyone passing Ellis' parked car would either go by the well or by Christian's house, and that the only house between the car and the well was the Oden place. The turn-row itself was simply a pathway through the crops. It consisted of two well-defined ruts with some grass

growing between the ruts and between the ruts and the crops. At the spot where Ellis' car was parked, corn was growing to the north (to the right going in), and cotton to the south (to the left going in) of the turn-row. There was a distance of about five or eight feet on each side of the turn-row between the ruts and the crops. If two vehicles met on the turn-row, one or both would have to swing out onto the grassy clearing in order to pass. With Ellis' car parked in the middle of the turn-row, occupying both ruts, any vehicle going by it would have to go around it on the five or eight feet of grass to the north or south of the car.

About 11:00 P. M., a Chevrolet 1½-ton truck with semitrailer, belonging to defendant Edwards, came along the turn-row. The truck, driven by Audrich with W. E. Parks as his helper, was proceeding west along the turn-row and was going to the well. As he neared the Ford coupe, Audrich swung his truck to his right so that he passed to the north of the Ford; and as the truck drew abreast of the Ford, Audrich stopped for a few seconds and talked with Ellis, inquiring if he could be of any assistance. Audrich then continued past the Ford back into the turn-row, and thence to the well.

Audrich went to the well that night to get a load of drill stems that defendant Edwards had contracted to haul away. However, when Audrich reached the well, the drill stems were still in the hole and he and Parks had to wait an hour and a half, or two hours. Finally, a few minutes after 1:00 A. M., the truck was loaded and started back to town. Audrich followed the same road on the return trip (the one by Oden's house). When he reached the Ford coupe, he swung to his left so that he again passed to the north of the Ford. This time, he did not stop but continued on his way to Monroe.

Sometime between 2:00 and 3:00 A. M., the workers on the well rig quit for the night and left for home. Howard Nixon, Travis Rider, Louis Ramsey and A. O. Rider left together in Nixon's car to go to Rayville. They, too, traveled the road by Oden's house. When they came to Ellis' car, they swung to their right to pass to the south of the Ford and, as they were passing the Ford, Ellis cried out, so that the four men stopped to see what was wrong. They found Ellis behind and to the side of the right real wheel of his car, lying partly in the rut of the turn-row. After a brief conversation, the men lifted Ellis into their car, turned around and drove him to Oden's house. A bruise across Ellis' chest and the subsequent medical examination revealed that Ellis had been run over by some car or truck. Leaving Ellis with Mrs. Oden, Nixon et al. immediately left with Mr. Oden to get a doctor. Not finding a doctor at Start, Mr. Oden was left off at the dirt road and the other four continued to Rayville where they got Dr. Chambers who drove promptly to the Odens and did what he could for Ellis; however, about 4:00 A. M., he died.

Ellis was survived by his father, the plaintiff. He had been married, but was divorced at the time of his death.

The negligence alleged on the part of defendants is that the truck driver failed to keep a proper lookout and that the brakes on the truck were defective.

Defendants deny all the allegations of plaintiff's petition and, further answering, aver:

"XVII. Further answering, defendants show that neither they nor any employee of John B. Edwards had any knowledge, information or intimation that an accident such as sued on had occurred until late in the morning of August 15, 1936, and at that time, upon obtaining information of plaintiff's present claim, a detailed investigation was conducted, as a result of which defendants are convinced that neither the truck of John B. Edwards nor any of his employees was in any way involved in the accident sued on. Consequently, defendants especially deny any allegation to the contrary.

"XVIII. In the alternative, however, and in the event the court should find that the said John B. Edward's truck, or any of his employees, was involved in said accident which, however, as aforesaid, is now and always denied, then and in that event defendants aver that the death of John Ellis was caused solely and proximately by the fault and want of care of the said John Ellis; in this connection, defendants showing that at or about 10:30 P. M., on August 14, 1936, Bernard Audrich, an employee of defendant, John B. Edwards, drove his truck belonging to said defendant, to which was attached a semi-trailer, in the course and scope of his employment from Monroe, Louisiana, to the location of an abandoned well on the Shelley Gaines plantation in Richland parish, Louisiana, for the purpose of removing the drill stem used in said well and remaining

at said location; that in order to reach said location, it was necessary to use a small dirt road, approximately six feet wide, with only one set of ruts, said road commonly known and designated as a turn-row, and which leads from a well-traveled dirt road through a field.

"XIX. That said Audrich drove defendant, John B. Edward's truck and semi-trailer over said turn row en route to said location at a slow rate of speed and in a careful and cautious manner with all lights on said truck burning; that while so traveling said turn row, he came upon a Ford automobile parked in the middle of same which said automobile was not equipped with proper lights, and if in fact was so equipped, without said headlights burning; and that in order to pass said parked car, said Audrich turned from said turn-row and drove through weeds and grass and thereafter proceeded to his destination.

"XX. That said Audrich, after leaving the location of the abandoned well aforesaid and at about 1:00 A. M., August 15, 1936, retraced the route taken by him and on reaching said location and ascertaining that said parked automobile was still in the approximate location, and in order to attempt to pass around said car, it was necessary for defendant's said driver to again leave said turn-row, which only permitted the passage of one car, and again traverse the weeds and grass surrounding. That said Audrich, in passing around the said parked automobile, did so in a careful and cautious manner, keeping a constant and careful lookout, as did his helper, also an employee of defendant, John B. Edwards, who also occupied said truck; that at said time the said truck was properly equipped with head and other lights, which were then operating; and that said maneuver was made without event.

"XXI. That for the reasons aforesaid and as otherwise set out above, defendants deny that the said truck and semi-trailer of defendant John B. Edwards ran over or was involved in any accident on the occasion alleged or at any other time; but in the alternative, as aforesaid, if for any reason the court should hold to the contrary, then and in that event defendants aver and show that the sole, only and proximate cause of the accident was the fault of said John Ellis in failing to provide for his own safety, in lying or sleeping in high grass or in other similar particulars.

"XXII. In the further alternative, defendants show that in the event the court should find that defendant John B. Edward's truck and employees were involved in said accident and that said employees were in any way negligent with respect thereto—both of said facts being again denied—that then and in that event the contributory negligence of the said John Ellis in blocking the narrow road over which defendant John B. Edward's truck and semi-trailer were forced to travel, in lying or sleeping in high grass and weeds at a dangerous point, in failing to provide for his own safety, in walking from behind said parked car into and under the wheels of the said truck and semi-trailer, in, according to defendants' information, being under the influence of intoxicants, or in any other manner in which the accident might have happened, bars recovery herein, and defendants especially plead said contributory negligence."

The lower court rejected plaintiff's demands and he is prosecuting this appeal.

Plaintiff relies chiefly upon circumstantial evidence to establish his claim, together with a statement alleged to have been made by the decedent at least one and one-half hours after the alleged accident in which he told the four oil well workers who discovered him that a truck loaded with drill stem had run over him. This testimony was admitted over objection by defendants that it was not a part of the res gestae. The lower court expressed its view that it was not admissible but allowed it in order for this court to have the benefit of it, if we considered it admissible.

The view expressed by the lower court is correct. It was not a part of the res gestæ and the declaration of the injured man was not admissible. As much as an hour and a half had elapsed since he was injured. He was suffering greatly but was entirely conscious, and thought he was going to die. During this period of time he was alone and had had sufficient time to deliberate fully over the matter. The circumstances were not such as to preclude the possibility of design, deliberation or fabrication. Donaldson v. Riddling's Succession, La.App., 145 So. 804; Bionto v. Illinois Cent. Railway Company, 125 La. 147, 51 So. 98, 27 L.R.A.,N.S., 1030; Holland v. Owners' Automobile Ins. Company, La. App., 155 So. 780.

This testimony, if held to be admissible, is very unsatisfactory. There were four men in the car who discovered the injured man lying in the road. One of them did not testify, due to illness. His testimony could have been taken by deposition and the court have the benefit of it. One who did testify, failed to testify as to any statement made by the injured man concerning the cause of his injury. All four of them were close to the injured man, carried him to his home in their car and there was no reason why all of them could not have heard any statement made, as it is contended that he cried out statements and asked for water to drink at the same time. One of them, a Mr. Rider, testified that he talked to the injured man soon after discovering him and that he said a truck had run over him, but did not describe the truck in any particular. Mr. Nixon, one of the four, testified that when decedent was asked what was the matter with him, he said: "I am dying. Give me a drink of water." Mr. Nixon testified to no other statement.

Mr. Louis Ramsey, another one of the four who discovered the man, testified that he said a truck loaded with drill pipe had run over him. It is rather strange that only one of the four remembered the decedent saying a truck loaded with drill pipe had run over him. These same witnesses testified that the decedent was fully conscious at the time and answered all questions they asked him, and that he and they discussed the accident. No one of them attempted to tell what he said as to where he was when run over or how he got under the wheels of the truck.

It is an evident fact that the wheels of defendant's truck did not run over decedent. Dr. Chambers, who was called to treat the injured man soon after his discovery in the road, was the only physician who saw him, and he testified that the only injury discernible on the decedent was a bruise extending diagonally across his chest about two or three inches wide. He later testified the bruise was diagonally across his abdomen. There was only the one bruise. Dr. Chambers was decedent's physician and was used by plaintiff as a witness. His description of decedent's external injuries we take as true.

The truck of defendant was equipped with dual wheels, the casings of them measuring fourteen inches in width. The truck alone weighed 7000 pounds. The truck and trailer together were thirty feet in length and the trailer was loaded with 7000 pounds of drill stem. The trailer was equipped with single rear wheels, the casings for which measured six inches in width. It was physically impossible for the truck wheels to have run over the decedent and leave a bruised place only two or three inches wide, and it is not certain that the rear trailer wheels would not have made a wider bruise. The truck driver and his helper both testified positively that the truck did not run over the decedent; that they were both keeping a careful lookout, due to the fact that the truck was forced to be driven out of the turn-tow and travel through high grass with the wheels on the north side of the truck in a slight ditch on that side of the road. They did not have any knowledge or information that the decedent had been run over until the next day about ten o'clock when informed by a deputy sheriff who was investigating the accident. Plaintiff relies chiefly upon testimony offered to show that no other vehicle passed the locus of the accident between 10:30 that night and 3 o'clock the next morning. We might assume that to be a fact, still it would not be sufficient to hold them liable for the accident.

The record discloses that the trailer wheels tracked those of the truck very closely. This evidence was given by plaintiff's witness, and the tracks made by the truck and trailer in the grass at the point of the accident, as revealed by the photographs in the record, confirm this testimony.

Since we have found as a fact that the truck itself did not pass over decedent's body and the wheels of the trailer tracked those of the truck, the only way decedent could have been run over by the trailer wheel was to stumble or fall under the trailer after the truck had passed. If that were the case, defendants are not liable.

Defendants are under no duty to show how decedent was injured. The burden is on plaintiff to show that the decedent was run over by defendant's truck and that his injuries and death were caused by the fault and negligence of defendant's truck driver. He has failed to show either with that degree of certainty and a preponderance of the testimony, as is required by law.

It is unnecessary to discuss decedent's condition at the time of the accident. However, it is an evident fact, as shown by the testimony of decedent's companion and the

truck driver and his helper, the only three men who are shown to have seen the decedent and conversed with him after his car was stopped on the night of the accident until he was discovered early the next morning, that decedent remained at the car because he did not want to go home and let his brother-in-law smell whiskey on his breath. He stated to his companion who was in the car with him when he stopped that he was afraid he and his brother-in-law would have a fight if he did go home with whiskey on his breath. However, his condition at the time is immaterial unless we should attempt to imagine what happened at the time of the accident and how he got under the rear trailer wheel, if he did.

Since we have found that plaintiff has failed to sustain the burden of proof required of him to make defendants liable, it becomes unnecessary to discuss the defense urged that plaintiff has failed to prove that his son, the decedent, who had been married and divorced, did not have any living children. Such proof, of course, was necessary for decedent's father to recover.

It is likewise unnecessary to discuss the alternative plea of contributory negligence.

We find no error in the judgment of the lower court and it is affirmed, with costs.